Raul MORALES, Petitioner,

v.

Charles GREINER, Respondent.

Jamal McRae, Petitioner,

v.

Floyd Bennett, Superintendent, Elmira Correctional Facility, Respondent.

Nos. 02–CV–1160 (ERK),
02–CV–3270 (ERK).

United States District Court,
E.D. New York.

July 28, 2003.

Raul Morales, Stormville, NY, Pro se.

Victor Barall, Kings County District Attorney, Brooklyn, NY, for Respondent.

### CORRECTED MEMORANDUM & ORDER

KORMAN, Chief District Judge,

Petitioner Raul Morales ("Morales") and petitioner Jamal McRae ("McRae") each seek a writ of *habeas corpus* primarily on the basis of ineffective assistance of counsel. I have consolidated these independent cases for the purpose of addressing an issue common to the claim of ineffective assistance of counsel under the Sixth Amendment. Specifically, the issue is whether a defendant who alleges that counsel was ineffective because he failed to raise an illegal search and seizure claim or make a *Batson* challenge can satisfy the requisite standard of prejudice necessary to succeed on an ineffective assistance of counsel claim.

### BACKGROUND

#### A. Facts and Procedural History of Morales v. Greiner

On April 9, 1998, Sergeant Patrick O'Malley, a supervisor in the Brooklyn South Narcotics District, oversaw a "tactical meeting," the purpose of which was to assign roles and distribute equipment for a "buy and bust" operation to be carried out later in the day. Among the officers who attended the meeting were Undercover Officer 2787 ("UC 2787"), Undercover Officer 31700 ("UC 31700"), Detective Charles Gallogly, and Detective Vincent Kennedy. UC 2787 was assigned as the team's "ghost"; UC 31700 was assigned to purchase narcotics; and Detective Gallogly was designated as the arresting officer (Tr. 104–12; 139–45; 179–82; 197–200; 273–76).

At approximately 5:45 p.m., the members of Sergeant O'Malley's team, all wearing street clothes, were in the vicinity of 4811 Fifth Avenue. UC 2787 was stationed directly across the street, sitting in an unmarked car with tinted windows. The defendant Morales was in front of the building, and UC 2787 observed three individuals, one at a time, approach Morales, touch hands with him, enter the vestibule of the building with him, and quickly return outside. Through the grating in the building's front door, UC 2787 was able to see in each instance some sort of transaction taking place in the vestibule; but he did not actually see any narcotics exchange hands. UC 31700 approached Morales and attempted to make a purchase, but was rebuffed by Morales, who told him: "Get the fuck out of here" (Tr. 141–51; 183–86).

UC 2787 continued to observe the scene outside 4811 Fifth Avenue. Before long, he observed a fourth man, later identified as Reynaldo Ruiz, approach Morales. Like the previous three individuals, Ruiz entered the vestibule of the building with Morales, engaged in some sort of transaction and exited shortly thereafter. Unlike the other occasions, however, UC 2787 distinctly saw Ruiz holding a glassine envelope in his hand as he emerged from the vestibule—the type of envelope UC 2787 knew to be used in packaging narcotics. UC 2787 radioed this information to the other members of his field team and they proceeded to arrest Ruiz. In Ruiz's possession, the officers found a glassine envelope stamped "Superpower" (Tr. 114–15; 150–54; 201–10; 275–77). UC 2787 verified that the individual that his fellow officers had arrested was the person he saw engage in a transaction with Morales. He then returned to his post near 4811 Fifth Avenue (Tr. 153–54).

Approximately twenty to twenty-five minutes later, Morales emerged from 4811 Fifth Avenue. UC 2787 radioed his field team who proceeded to arrest Morales.

UC 2787 then confirmed with the field team that the correct person had been taken. Morales was frisked at the scene and approximately $83 was recovered from him. Morales was taken to the 72nd precinct station house for processing, where he was subjected to a strip search. Eleven glassine envelopes stamped "Superpower" were recovered from his underwear. Additionally, Morales' belt was removed pursuant to police procedures. The belt had a secret compartment which, when opened, yielded twelve more glassine envelopes marked "Superpower" (Tr. 117–25; 155–58; 170; 210–31; 278–83). The contents of the glassine envelopes were tested for the presence of controlled substances. All of the envelopes—the one envelope recovered from Reynaldo Ruiz and the twenty-three envelopes recovered from Morales—contained heroin (Tr. 251–59; 261–71).

A suppression hearing was held regarding the evidence recovered from Morales following his arrest. Officer Gallogly testified at the hearing and the trial judge ruled that the officers had probable cause to arrest Morales, the search was legal and the heroin recovered from Morales was admissible. Following a jury trial, Morales was convicted of one count of Criminal Sale of a Controlled Substance in the Third Degree and two counts of Criminal Possession of a Controlled Substance in the Third Degree. He was sentenced to three concurrent terms of imprisonment of ten to twenty years. On appeal from the judgment of conviction Morales argued: a) that the trial court's charge concerning his decision not to testify deprived him of a fair trial; and b) that his sentence was harsh and excessive. On June 19, 2000, the Appellate Division affirmed Morales' judgment of conviction. *People v. Morales,* 273 A.D.2d 412, 711 N.Y.S.2d 727 (2d Dep't.2000). Leave to appeal to the Court of Appeals was denied. *People v. Morales,* 95 N.Y.2d 869, 715 N.Y.S.2d 223, 738 N.E.2d 371 (2000).

On May 22, 2001, Morales moved for a writ of error *corram nobis* on the ground that he had received ineffective assistance of appellate counsel. Specifically, Morales contended that his appellate counsel was ineffective for failing to raise a claim that the police lacked probable cause for his arrest. On October 29, 2001, the Appellate Division denied Morales' application for a writ of error *corram nobis,* finding that he had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Morales,* 287 A.D.2d 743, 732 N.Y.S.2d 184 (2d Dep't 2001). Morales subsequently filed this petition for a writ of *habeas corpus,* alleging the same ground of ineffective assistance of counsel that was rejected in his application for a writ of error *coram nobis.* He also appears to raise a freestanding claim that his arrest was not supported by probable cause.

### B. Facts and Procedural History of McRae v. Bennett

On the evening of September 17, 1994, John Morales (no relation to petitioner Raul Morales), a driver for National Car Service, went to 160–08 75th Road in Flushing, Queens, to pick up a fare (Tr. 584). According to Mr. Morales, petitioner Jamal McRae and three other young men came out of the building and got into the taxi (Tr. 586–88). Morales described McRae, who sat down next to him in the front seat of the car, as 5'6" tall, with a thin build, wearing black pants and a black tee shirt and jacket. His hair was medium in length and "tightly curled" (Tr. 586). Morales also thought that petitioner may have been Jamaican based on his facial features, hair, and the cap he wore when he first got into the car, but not based on his accent (Tr. 587, 622, 623, 627, 632, 637–

38). Two other black men and a white or Hispanic man sat in the back seat of the car (Tr. 589). Morales drove the passengers to Canal Street in Manhattan for an outdoor festival. Upon arrival, there were not many people there due to the rain, so, at the passengers' request, Morales drove them back to 76th Road and 166th Street in Queens (Tr. 590). When they arrived, the Hispanic man who sat behind Morales held a razor to the driver's neck. When Morales tried to grab it, the man pulled the razor back, cutting two of Morales' fingers on his left hand (Tr. 591).

Petitioner McRae then took out a silver revolver and told Morales to give them all of his money (Tr. 591, 596–97). Morales gave McRae his wallet but McRae cursed him and demanded more money. McRae then pulled a gold chain off of Morales' neck and threatened to kill him, but one of the accomplices told him not to, because the car service had their address and telephone number (Tr. 591–92). McRae proceeded to strike Morales on the right side of his head three times with the butt of his gun. Morales briefly lost consciousness, and when he came to he found the Hispanic man reaching over the front seat to turn off the car (Tr. 592–93). The other two men struck Morales a number of times, and then all four assailants made their getaway (Tr. 593–94).

Morales, who was disoriented and bleeding profusely from his hand and forehead, called his dispatcher and informed her of the incident. The dispatcher relayed his story to the police and two co-workers arrived at Morales's location shortly thereafter along with several bystanders from nearby apartment buildings (Tr. 594–95).

Police Officer Edwin Boone testified that he received a radio run about the robbery at about 12:29 a.m. (Tr. 648). He and his partner arrived at the scene a few minutes later and saw Morales sitting in front of his car with all the doors open.

Morales was rocking back and forth and crying, and there was blood on his head, hands, and clothing (*Id.*). Morales told the officers what happened, though he had difficulty communicating his story as he spoke little English (Tr. 596, 583–84, 649). He gave Officer Boone McRae's address and described him as a black male, who was about 5'8" tall, with brown eyes and black hair (Tr. 650). According to Boone, Morales said that McRae was wearing all black clothing and sneakers and wore his hair in "dreds" (Tr. 653). Although Morales testified that he never told the police that McRae had a Jamaican accent, Officer Boone claimed that he asked Morales whether petitioner had a Jamaican accent and that Morales responded, "Yes, Jamaican" (Tr. 669).

After speaking to police, Morales was taken by ambulance to Booth Memorial Hospital, where he received 17 stitches in his forehead and 14 stitches in his two fingers (Tr. 597–98). At the hospital, Officer Boone obtained McRae's telephone number from the dispatcher as the one who called for the car service, as well as the apartment number from which the call was placed, 160–08 75th Road (Tr. 651, 655).

A little less than two months later, on November 9, 1994, Mr. Morales drove to the vicinity of 164th and 166th Streets and 75th and 76th Avenues, at which time he spotted McRae inside of a bodega (Tr. 599). Recognizing him as the assailant who had struck him with the revolver, Morales immediately went to the nearest police station and informed them of the encounter. On the advice of the officers in the precinct, he called 911 (Tr. 599–600). Police Officer Rosemary LaPorte received a radio run that day at about 12:50 a.m. for a past robbery (Tr. 690). Officer LaPorte went to 164th Street and 76th Avenue a few minutes later, and saw other officers

speaking with Mr. Morales (Tr. 691). Officer LaPorte noticed that Morales was having trouble communicating with the officers, so she spoke to him in Spanish. Morales told her that he saw McRae, the man who had robbed him in September, inside the bodega (Tr. 600, 692). Morales told the officers that he was sure McRae was the man who had robbed him (Tr. 600).

Officer LaPorte arrested petitioner and brought him to the 107th precinct to process his arrest. McRae confirmed that he lived at 160–08 75th Avenue, in apartment 1B, and that his telephone number was (718) 591–4591–the same address and number obtained from Morales' dispatcher (Tr. 694). McRae also told Officer LaPorte that his date of birth was October 20, 1973, that he was 21 years old, and that he was 5'8" tall and weighed 158 pounds (Tr. 694–95). According to the testimony of Officer LaPorte and Mr. Morales, McRae had medium length hair that he wore in dredlocks at the time of his arrest (Tr. 589, 601, 639, 697).

McRae's defense was mistaken identity. Although he did not testify, he offered into evidence his birth certificate, which showed that he was born on October 18, 1973 in Queens, N.Y., not Jamaica (Tr. 716). Petitioner's mother, Theresa McRae also testified that on the night of the robbery she had thrown a birthday party for her husband. She explained that McRae left the party at about 8:00p.m., but then returned home at about 11:00p.m. However, she later admitted that she didn't know exactly when McRae arrived home. Theresa McRae also testified that her other son Eddy was at the party with several of his friends, one of whom had dredlocks and two of whom were black. She testified that Eddy's friends left the party at approximately 10:00 p.m. after receiving a phone call at the house. Nevertheless, on cross examination Mrs. McRae admitted that the party took place on Sunday night, the day *after* the robbery, which occurred on Saturday night (Tr. of First Trial 201–210).

McRae's first trial ended in a mistrial after the jury was unable to agree on a unanimous verdict. In the subsequent retrial, McRae's mother was not called to testify. After hearing the evidence, the jury convicted McRae of two counts of first-degree robbery, two counts of second-degree robbery, and one count of second-degree assault. On November 7, 1996, the court sentenced McRae, as a second felony offender, to concurrent, indeterminate terms of from six to twelve years for each of the first-degree robbery counts, from four to eight years for each of the second-degree robbery counts, and from two and one-half to five years for the assault count.

In a motion dated March 27, 2000, McRae asked the trial court to vacate his judgment of conviction pursuant to N.Y.Crim. Proc. Law ("CPL") §§ 440.10(1)(h) and 440.20(1) on the ground that it was obtained in violation of his constitutional right to the effective assistance of counsel (Exhibit A attached to Affidavit of Robin Forshaw dated June 13, 2003). McRae argued that his trial counsel had provided constitutionally deficient representation at his second trial because he had refused to call Theresa McRae as a witness, even though she had testified at the first trial which resulted in a hung jury. McRae also contended that his trial counsel had not objected to the prosecution's use of peremptory challenges to strike all non-white potential jurors. Finally, McRae argued that his trial counsel had an "appalling conflict of interest" as a result of his having had McRae's parents sign a confession of judgment for the amount of $7,375 in attorney's fees and his filing a lien against their assets (*Id.* at 7–9).

In response to McRae's claims, the prosecution submitted an affirmation from McRae's trial counsel, Morris Mirsky, in which he stated that he made a conscious, reasoned decision not to call Mrs. McRae to the stand (Affirmation of Morris Mirsky, Exhibit B to Forshaw Aff.). Although Mirsky did not reveal what that strategy had been, the prosecution noted that the record of the first trial showed that Mrs. McRae's testimony concerned the night of September 18, the day after the robbery, and she had therefore provided an alibi for the wrong date. This inconsistency justified counsel's decision not to call her for the subsequent retrial.

In a memorandum decision dated June 15, 2000, Justice Cooperman denied petitioner's motion to vacate the judgment in its entirety. *People v. Jamal McCrae,* No. 5474/94 (N.Y. Queens Cty.Crim. Ct. June 15, 2000). Justice Cooperman held that McRae's claims regarding his trial counsel's failure to call Theresa McRae and failure to raise a *Batson* challenge were procedurally barred from review under CPL § 440.10(2)(b), because they were based on facts appearing in the record and could be raised on direct appeal. Justice Cooperman also held that McRae had failed to establish that he was denied the effective assistance of counsel in any event. With respect to counsel's failure to have called Mrs. McRae at the second trial, Justice Cooperman observed that, while the crime occurred on a Saturday night, September 17, 1994, Mrs. McRae had testified about events that had occurred on Sunday night, September 18, the date of her husband's 51st birthday. *Id.* at 3–4. Because of these inconsistencies in Mrs. McRae's testimony developed during cross examination in the first trial, Justice Cooperman found her testimony at the second trial to be "problematic" and "no longer useful." *Id.* at 4. The Justice also noted that McRae's argument concerning his mother's testimony being the only differ-ence between the trials (and hence the deciding factor in the original hung jury) was mere speculation. *Id.*

With respect to the *Batson* claim, Justice Cooperman found that McRae had failed to establish that any impropriety had even occurred at the trial, and that absent a showing that a viable *Batson* claim existed, McRae's allegation of ineffective assistance of counsel was "baseless." *Id.* at 6. As to the fee arrangement, the court found that even if the arrangement was "less than ethically recommended," McRae had not established that it had any influence on his attorney's conduct, especially because the fee arrangement had been in place prior to the first trial, about which McRae made no complaint. *Id.* at 7–8. After his § 440.10 motion was denied McRae moved for permission to appeal to the Appellate Division, but leave to appeal was denied on September 27, 2000.

On November 21, 2000, McRae filed a direct appeal of his conviction in the Appellate Division, Second Department. He raised two claims: (1) that the verdict was against the weight of the evidence; and (2) that his sentence was unduly harsh and excessive under the circumstances. In a decision dated May 7, 2001, a four-judge panel of the Appellate Division, Second Department, unanimously affirmed McRae's judgment of conviction. *See People v. McRae,* 283 A.D.2d 443, 724 N.Y.S.2d 625 (2d Dep't 2001). The Appellate Division held that the verdict was not against the weight of the evidence and that McRae's sentence was not excessive. Leave to appeal to the Court of Appeals was denied. *People v. McRae,* 96 N.Y.2d 865, 730 N.Y.S.2d 39, 754 N.E.2d 1122 (2001).

In his petition for a writ of habeas corpus dated May 21, 2002, McRae raises two grounds for relief. First, petitioner con-

tends that he was denied the effective assistance of counsel due to his trial counsel's failure to raise a *Batson* challenge, his failure to call Mrs. McRae as a witness, and by a fee arrangement that created a conflict of interest. Second, McRae claims, as he did on direct appeal, that the jury's verdict was against the weight of the evidence.

## DISCUSSION

### I. THE FAILURE OF COUNSEL TO RAISE A FOURTH AMENDMENT OR BATSON CHALLENGE CANNOT SATISFY THE STRICKLAND STANDARD OF PREJUDICE AND THEREFORE DOES NOT MERIT HABEAS RELIEF

■ To the extent that petitioner Morales claims relief on the basis of an alleged Fourth Amendment violation (specifically that he was arrested without probable cause), such relief is explicitly precluded by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In determining that federal courts should withhold habeas review where the State had already provided an opportunity for full and fair litigation of a Fourth Amendment claim, *Stone* grounded its holding on the crucial finding that the exclusionary remedy for Fourth Amendment violations provided by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), "is not a personal constitutional right." *Stone*, 428 U.S. at 486, 96 S.Ct. 3037. The Court reasoned that the rule "is not calculated to redress the injury to the privacy of the victim of the search or seizure," but rather is predominately a " 'judicially created' structural remedy 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.' " *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)); *see also Withrow v. Williams*, 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (recognizing that *Mapp's* exclusionary rule serves only "some value necessarily divorced from the correct ascertainment of guilt").

The *Stone* Court further noted that "[a]s in the case of any remedial device, 'the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.' " *Id.* at 486–87, 96 S.Ct. 3037 (quoting *Calandra*, 414 U.S. at 348, 94 S.Ct. 613). Thus, while accepting that the exclusionary rule's deterrent effect outweighs its costs when enforced at trial and on direct appeal, the Court found any "additional contribution . . . of the consideration of search-and-seizure claims . . . on collateral review," to be too small in relation to the costs to justify federal habeas review. *Id.* at 492–95, 96 S.Ct. 3037. Indeed, the Court recognized the significant costs of applying the exclusionary rule even at trial and on direct review:

> The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant. As Mr. Justice Black emphasized in his dissent in *Kaufman:*
>
> > A claim of illegal search and seizure under the Fourth Amendment is crucially different from many other constitutional rights; ordinarily the evidence seized can in no way have been rendered untrustworthy by the means of its seizure and indeed often this evidence alone establishes beyond vir-

tually any shadow of a doubt that the defendant is guilty.

*Id.* at 489–90, 96 S.Ct. 3037 (quoting *Kaufman v. United States,* 394 U.S. 217, 237, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969) (Black, J., dissenting)).

Further underlying the Court's decision to remove violations of the Fourth Amendment from the realm of habeas review was its fundamental understanding that "[r]esort to habeas corpus, especially for purposes other than to assure that no innocent person suffers an unconstitutional loss of liberty, results in serious intrusions on values important to our system of government." *Stone,* 428 U.S. at 491 n. 31, 96 S.Ct. 3037. These intrusions include: " '(i) the most effective utilization of limited judicial resources, (ii) the necessity of finality in criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded.' " *Id.* (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 259, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)) (Powell, J., concurring).

■ Despite these misgivings, the Supreme Court refused to extend *Stone v. Powell* to habeas petitions grounded on the failure of trial counsel to raise a Fourth Amendment claim. In *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), the majority held that a federal habeas corpus petition lies to challenge the effectiveness of defense counsel in failing to move to suppress evidence despite the general holding of *Stone v. Powell* that Fourth Amendment violations do not merit habeas relief. Writing for the Court, Justice Brennan reasoned that because the "right of an accused to counsel is beyond question a fundamental right", many of the concerns expressed in *Stone* were inapplicable to a petition based on the Sixth Amendment. *Id.* at 377, 106

S.Ct. 2574. Brennan also dismissed *Stone's* analysis of the limited benefit of extending *Mapp's* exclusionary remedy to habeas corpus where petitioners had already received a full and fair opportunity to litigate the issue in State court:

> Because collateral review will frequently be the only means through which an accused can effectuate the right to counsel, restricting the litigation of some Sixth Amendment claims to trial and direct review would seriously interfere with an accused's right to effective representation ... Indeed, an accused will often not realize that he has a meritorious ineffectiveness claim until he begins collateral review proceedings, particularly if he retained trial counsel on direct appeal.

*Id.* at 378, 106 S.Ct. 2574.

Notwithstanding language in Justice Brennan's opinion suggesting otherwise, the holding of *Kimmelman* was quite limited in scope since the parties did not raise the "more difficult question ... [of] whether the admission of illegally seized but reliable evidence can ever constitute 'prejudice' under [*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ]." *Kimmelman,* 477 U.S. at 391, 106 S.Ct. 2574 (Powell, J., concurring). To prevail on an ineffective assistance of counsel claim, a defendant must show both that counsel's representation fell below an objective standard of reasonableness, *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and that the defendant was prejudiced by counsel's representation. *Id.* at 694, 104 S.Ct. 2052. *Strickland's* prejudice standard requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

In his concurring opinion to *Kimmelman*, Justice Powell expressed considerable doubt that the erroneous admission of reliable evidence could ever be deemed prejudicial in the context of ineffective assistance of counsel claims on habeas review. According to Justice Powell, *Strickland* makes clear "the right to effective assistance of counsel is personal to the defendant, and is explicitly tied to the defendant's right to a fundamentally fair trial—a trial in which the determination of guilt or innocence is 'just' and 'reliable.'" *Kimmelman*, 477 U.S. at 392–393, 106 S.Ct. 2574 (Powell, J., concurring). He then argued that

> the admission of illegally seized but reliable evidence does not lead to an unjust or fundamentally unfair verdict.... Indeed, it has long been clear that exclusion of illegally seized but wholly reliable evidence renders verdicts less fair and just, because it 'deflects the truth-finding process and often frees the guilty' ... Thus, the harm suffered by respondent in this case is not the denial of a fair and reliable adjudication of his guilt, but rather the absence of a windfall. Because the fundamental fairness of the trial is not affected, our reasoning in *Strickland* strongly suggests that such harm does not amount to prejudicial ineffective assistance of counsel under the Sixth Amendment.

*Id.* at 396, 106 S.Ct. 2574 (internal citations and footnotes omitted).

Justice Powell also identified prior Supreme Court cases as "emphasiz[ing]" that the "very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." (*Kimmelman*, 477 U.S. at 396, 106 S.Ct. 2574) (Powell, J., concurring) (internal citations omitted, italics in original). He argued that it would "shake" the right to effective assistance of counsel "loose from

its constitutional moorings to hold that the Sixth Amendment protects criminal defendants against errors that merely deny those defendants a windfall." *Id.* at 397, 106 S.Ct. 2574. As he articulated based on the facts in *Kimmelman:*

> In this case, for example, the bedsheet [the evidence challenged in the case which contained biological evidence linking defendant to the crime] may have provided critical evidence of respondent's guilt, evidence whose relevance and reliability cannot seriously be questioned. The admission of the bedsheet thus harmed respondent only in the sense that it helped the factfinder make a well-informed determination of respondent's guilt or innocence. In my view, nothing in Strickland compels us to conclude that such an 'injury' establishes prejudice for purposes of respondent's ineffective assistance claim.

*Id.*

The reasoning of *Strickland* supports Justice Powell. In *Strickland,* the Court emphasized that "[t]he Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland,* 466 U.S. at 685, 104 S.Ct. 2052. The Court went on to state that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. Moreover, in defining "reasonable probability," the Court noted that a "reasonable probability is a probability *sufficient to undermine confidence in the outcome.*" *Id.* at 694, 104 S.Ct. 2052 (emphasis added). Indeed, the Court stressed that the "reasonable probability" test must

be applied with an eye towards the ultimate fairness of the defendant's conviction:

A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.*, at 696, 104 S.Ct. 2052 (emphasis added).

As Justice Powell observed, "[t]his reasoning strongly suggests that only errors that call into question the basic justice of the defendant's conviction suffice to establish prejudice under *Strickland.*" *Kimmelman,* 477 U.S. at 395, 106 S.Ct. 2574. Because the admission of illegally seized but reliable evidence does not affect the fairness of the trial, the failure to raise Fourth Amendment violations will never satisfy the level of prejudice required by *Strickland.* *Id.* at 396, 106 S.Ct. 2574; *see also United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (evidence ordinarily is excluded under *Mapp* only for deterrence reasons that have no relation to the fairness of the defendant's trial). As discussed in *Stone v. Powell,* the exclusion of illegally seized but wholly reliable evidence renders verdicts less fair because it "deflects the truthfinding process and often frees the guilty." 428 U.S. at 490, 96 S.Ct. 3037.

Justice Powell's arguments were adopted in *Holman v. Page,* 95 F.3d 481, 491 (7th Cir.1996), *cert. denied,* 520 U.S. 1254, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997). The Seventh Circuit held that, while "[s]upressing reliable evidence can undoubtedly have an impact on the outcome of a trial, and in that sense the failure of defense counsel to properly argue a Fourth Amendment claim can prejudice his client," that is not the "prejudice" envisioned by *Strickland.* *Id.* at 491. Relying principally on Justice Powell's insight, the Seventh Circuit went on to find habeas relief unwarranted on the grounds of an appellate attorney's failure to contest an erroneous Fourth Amendment ruling:

It is inconsistent with the function of the exclusionary rule to permit a criminal defendant on federal habeas review to claim prejudice because but for his counsel's incompetence on the suppression issue he would have gotten away with the crime. Such a claim may be factually true—but that alone does not entitle a convict to a new trial because that alone does not constitute "prejudice" within the meaning of *Strickland.* *Strickland* prejudice relates to the fairness of the proceedings and to the confidence one may place in the outcome, i.e., to the correctness of the verdict. The Supreme Court has made clear that it is not unfair to a defendant for a jury to consider reliable but improperly gathered evidence of guilt. Fairness to the accused has nothing to do with the purpose of the exclusionary rule, which is why Fourth Amendment claims cannot be raised on habeas review.

*Id.* at 491. *See also Woods v. Whitley,* 933 F.2d 321, 324 (5th Cir.1991) ("[W]e are hard put to see how the erroneous receipt into evidence of evidence illegally seized could ever result in prejudice sufficient to justify its omission from an earlier [petition for] writ [of habeas corpus].") (citing

*Kimmelman,* 477 U.S. 365, 396, 106 S.Ct. 2574, 91 L.Ed.2d 305 (Powell, J., concurring)).

The Supreme Court also appeared to adopt Justice Powell's concern for the fundamental fairness of a conviction when considering a Sixth Amendment claim based on the failure of counsel to raise a Fourth Amendment violation. *See Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). Chief Justice Rehnquist, who joined in Justice Powell's concurrence in *Kimmelman,* wrote for the majority in *Lockhart,* which held that an attorney's failure to raise a valid objection at sentencing did not constitute prejudice under *Strickland* where the law supporting such an objection had been overruled subsequent to the defendant's trial. Instead of considering merely the outcome of the proceeding, the Court evaluated prejudice by determining whether counsel's errors rendered the result of the proceeding unreliable or fundamentally unfair. *Id.* at 366, 113 S.Ct. 838. This concern with the fairness of defendant's conviction was prompted by the Court's recognition that " 'the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.' " *Id.* at 368, 113 S.Ct. 838 (quoting *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). In rejecting an analysis focusing solely on outcome determination, the Court reasoned that "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart,* 506 U.S. at 369–70, 113 S.Ct. 838.

Notwithstanding the Supreme Court's broad declaration that "an analysis focus-ing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective," *Lockhart,* 506 U.S. at 369, 113 S.Ct. 838, the Court seemingly retrenched its position in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Williams* held that *Lockhart* did not modify or supplement the *Strickland* test, which provides "sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims ..." *Id.* at 391, 120 S.Ct. 1495. The Court overturned a decision by the Virginia Supreme Court which held, based on *Lockhart,* that a mere difference in outcome was not sufficient to establish constitutionally ineffective assistance of counsel without demonstrating that the result was fundamentally unfair. The Virginia Supreme Court read the Supreme Court's decision in *Lockhart* to require a separate inquiry into fundamental fairness even though the defendant was able to show that his lawyer was ineffective in not investigating and presenting mitigating evidence at sentencing and that his ineffectiveness probably affected the outcome of the proceeding, i.e., the imposition of the death penalty. Finding that the Virginia Court's conclusion was an "unreasonable application" of clearly settled law, the Supreme Court held that the narrow exception recognized in *Lockhart* "do[es] not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him." *Id.* at 393, 120 S.Ct. 1495 (emphasis in original). *See, also, Glover v. United States,* 531 U.S. 198, 202–03, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001) (*Lockhart* does not justify a departure from a straightforward application of *Strickland* unless the ineffectiveness of counsel does not deprive the defendant of a substantive or procedural right to which

the law entitles him); *Northrop v. Trippett*, 265 F.3d 372, 384–85 (6th Cir.2001) ("The fairness analysis discussed in *Lockhart* supplants the *Strickland* analysis in only very limited circumstances.").

But *Strickland* specifically held that a criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Indeed, the very definition of "reasonable probability" is grounded on whether the ineffectiveness is "sufficient to *undermine confidence in the outcome*." *Id.* at 694, 104 S.Ct. 2052 (emphasis added). This standard is taken from cases involving *Brady* violations, *id.* at 694, 104 S.Ct. 2052, a context in which the Supreme Court has consistently reinforced that the fundamental concern is a fair trial—"understood as a trial resulting in a verdict worthy of confidence":

> [Under *Brady* and its progeny, the] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Thus, it is unclear exactly how a straightforward application of *Strickland* renders irrelevant the effect of counsel's dereliction in "undermining confidence in the outcome of the trial." Indeed, in a recent post-*Williams* capital case where the California Supreme Court denied habeas corpus relief based on a claim of ineffective assistance of counsel, the Supreme Court noted with approval "the California Supreme Court's proper framing of the question as whether the evidence 'undermines confidence' in the outcome." *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002). The California Supreme Court's framing of the question mirrors the language of Justice Powell's *Kimmelman* opinion: "In demonstrating prejudice, . . . the petitioner must establish that as a result of counsel's failures the trial was unreliable or fundamentally unfair." *In re Visciotti*, 14 Cal.4th 325, 352, 14 Cal.4th 1089A, 58 Cal.Rptr.2d 801, 926 P.2d 987 (1997).

Nevertheless, there is a standard for evaluating whether rights that have been forfeited by counsel satisfy the prejudice prong of *Strickland* that makes some sense of the inconsistent positions in *Visciotti* and *Williams*. While the ineffective assistance of counsel claims of the petitions in this case would fail under this standard, most claims of ineffective assistance of counsel would be sustained if the forfeited right affected the outcome. This effort to resolve the tension between *Strickland* and *Williams* proceeds from the premise that almost all of the rights that are afforded to defendants in criminal cases are intended to permit an attack on the prosecution's case without regard to the guilt or innocence of the defendant and to enable defense counsel to seek an acquittal even of a guilty defendant. Indeed, under our adversarial system, it is beyond dispute that a criminal defendant is entitled to a fair trial even though he may be guilty, that the purpose of such a trial is to determine whether the prosecution can meet its burden of proof, and that the role of counsel is to put the prosecution to its proof, even if the defendant is guilty. *See Kimmelman*, 477 U.S. at 380, 106 S.Ct. 2574

("[w]e have never intimated that the right to counsel is conditioned upon actual innocence").

Under these circumstances, as the holding in *Williams* suggests, it would not be appropriate for the prejudice prong of *Strickland* to turn on whether confidence in the outcome has been undermined. The more pertinent focus is on whether the defendant has been deprived of a substantive or procedural right that undermines his ability to subject the case against him to adversarial testing. *See Strickland,* 466 U.S. at 685, 104 S.Ct. 2052 (recognizing that "a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding") (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275–76, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

The following excerpt from Mr. Justice White's concurring opinion in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), contrasting the role of the prosecutor and defense counsel, is one that is significant for its candid discussion of the role of defense counsel consistent with the preceding discussion:

> Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all; nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but, absent a voluntary plea of guilty, we also insist that he defend his client whether he is innocent or guilty.

> The State has the obligation to present the evidence. Defense counsel need present nothing, even if he knows what the truth is. He need not furnish any witnesses to the police, or reveal any confidences of his client, or furnish any other information to help the prosecution's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course. Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth. Undoubtedly there are some limits which defense counsel must observe but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying. In this respect, as part of our modified adversary system and as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relation to the search for truth.

*Id.* at 256–58, 87 S.Ct. 1926.

This description of the role of defense counsel is consistent with the cases holding that defendants are entitled to the representation of competent assistance of counsel with respect to the decision whether to enter a guilty plea. In this context, there is generally no question of the defendant's guilt or innocence, nor would the absence of counsel undermine confidence in the outcome. Nevertheless, counsel is required because a defendant is in the position of waiving fundamental constitutional rights, indeed, the very right to test the government's evidence through the adversary process, and is thus entitled to counsel so that he is carefully apprised of those rights and the consequences of giving

them up, and whether he *should* give them up. *See, e.g., Fortenberry v. Haley,* 297 F.3d 1213 (11th Cir.2002) (even when a defendant tells his attorney that he wishes to plead guilty, defense counsel has an obligation to make an independent examination of the facts and circumstances of the case and recommend whether to enter a plea of guilty); *United States v. Peterson,* 233 F.Supp.2d 475 (E.D.N.Y.2002) (effective assistance of counsel requires a defense attorney to provide her client with the benefit of counsel's professional advice concerning the crucial decision whether to plead guilty or go to trial; the failure to communicate a plea offer or to provide adequate advice about a plea offer constitutes substandard performance).

 Because our "modified adversary system ... countenance[s] or require[s] conduct [by counsel] which in many instances has little, if any relation to the search for truth," *Wade,* 388 U.S. at 257–58, 87 S.Ct. 1926, it must necessarily follow that conduct by counsel that forfeits a substantive or procedural right intended to subject the case against the defendant to adversarial testing violates the Sixth Amendment and entitles the defendant to relief if there is a reasonable probability that it affected the outcome, even if it does not undermine confidence in the outcome. Nevertheless, there are a relatively small number of procedural rights that are not conferred on a defendant because they enhance "the modified adversary system." Instead, they are intended to further underlying policies that, while significant, are unrelated to the conduct of the trial or proper functioning of our "modified adversary system." Where an attorney's dereliction deprives the defendant of such a right, it is not enough that the result of the trial was affected. Instead, at the very least there should be a showing that the policy underlying the substantive or procedural right would be undermined by denying relief.

█ There is sufficient play in the language of *Williams* to accommodate this result. *Williams* recognized that "there are situations in which the overriding focus on fundamental fairness may affect the analysis." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495. Indeed, the Court identified "situations in which it would be unjust to characterize the likelihood of a different outcome as 'prejudice.' " *Id.* at 391–92, 120 S.Ct. 1495. For instance, even if a defendant's false testimony might have resulted in acquittal, it is not fundamentally unfair to conclude that he was not prejudiced by his counsel's efforts to prevent him from testifying. *See Nix v. Whiteside,* 475 U.S. 157, 175–176, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). Similarly, the likelihood of a different outcome attributable to an incorrect interpretation of the law or legal standard subsequently overturned, as in *Lockhart,* "should be regarded as a potential 'windfall' to the defendant rather than the legitimate 'prejudice' contemplated by ... *Strickland." Williams,* 529 U.S. at 392, 120 S.Ct. 1495.

These consolidated cases present a compelling argument for applying the exception recognized in *Williams.* It is without question that, even if the dereliction of counsel resulted in a conviction resting on the erroneous admission of heroin envelopes obtained from petitioner Morales' belt and underwear, he was not deprived of a right intended to assure the adversarial testing of the prosecution's case. Indeed, *Mapp's* exclusionary rule does not implicate the adversary process; nor does the loss of the exclusionary remedy in any way affect the defendant's ability to "put the State to its proof." *Wade,* 388 U.S. at 258, 87 S.Ct. 1926; *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 241, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amend-

ment."). As the Supreme Court explained in declining to apply the *Mapp* exclusionary rule to convictions that had become final before *Mapp* was decided, the exclusionary rule is different from those cases which had been given retroactive effect. Unlike *Mapp,* those cases involved rights that went "to the fairness of the trial—the very integrity of the fact-finding process. Here ... the fairness of the trial is not under attack." *Linkletter v. Walker,* 381 U.S. 618, 639, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

■ While the exclusionary rule, the benefits of which counsel's dereliction may have cost petitioner, serves to deter violations of the Fourth Amendment, no one would suggest that the deterrent effect of the exclusionary rule would be undermined by the possibility of an occasional error by trial or appellate counsel in not invoking it. Indeed, any such effect is even more attenuated where, as here, the issue was raised by trial counsel and abandoned on appeal. As Justice Powell argued so compellingly in *Kimmelman,* granting habeas relief where the sole claim of ineffectiveness is the failure to exclude illegally obtained but otherwise highly reliable evidence serves no purpose other than to generate the precise "windfall" decried by the Court in *Williams* and *Lockhart.* The exclusion of such evidence harms the defendant "only in the sense that it helped the factfinder make a well-informed determination of respondent's guilt or innocence." *Kimmelman,* 477 U.S. at 397, 106 S.Ct. 2574 (Powell, J., concurring). Accordingly, a straightforward application of *Strickland,* even after *Williams,* suffices to deny defendant a mistrial on the grounds of ineffective counsel. This is true whether the ineffective assistance of counsel claim is raised on direct appeal or in a habeas corpus petition.

■ The foregoing argument is even more compelling when considering peti-

tioner McRae's claim of ineffective assistance of counsel based on the failure to raise a claim of racial discrimination in jury selection under *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The use of racially discriminatory peremptory challenges is condemned because it violates the Equal Protection Clause right of an excluded juror. *See Allen v. Hardy,* 478 U.S. 255, 259, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) ("Our holding [in *Batson*] ensures that states do not discriminate against citizens who are summoned to sit in judgment against a member of their own race and strengthens public confidence in the administration of justice."). Indeed, a *Batson* challenge (of the kind allegedly forfeited here by the dereliction of counsel) is available to the prosecutor as well as the defendant, *see Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and to both sides in a civil case. *See Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). The right to vicariously assert a juror's equal protection claim is afforded to the parties because it is the only practical way of ensuring against discrimination in petit jury selection. Moreover, as was the case with the *Mapp* exclusionary rule, the Supreme Court declined to apply *Batson* retroactively because it did not undermine the defendant's right to a fair trial. *Allen,* 478 U.S. at 258–60, 106 S.Ct. 2878. By the time a case reaches its appellate stage, it is too late to rectify the injury to the challenged jurors. Nevertheless, for reasons that have been questioned, reversal is a remedy where the issue has been preserved. *See United States v. Alvarado,* 923 F.2d 253, 254 (2d Cir.1991) (Newman, J.) (arguing persuasively that, even on direct appeal, "in those rare cases where the corrective action required to be taken by *Batson* during jury selection is not taken, the incremental ben-

efit of enforcing *Batson* by reversing convictions obtained with fairly representative juries was not warranted.") (internal citation omitted); *Galarza v. Keane*, 252 F.3d 630, 641–44 (2001) (Walker, C.J., dissenting) (questioning whether *Batson* should provide any basis for habeas relief).

■ Because the unasserted *Batson* claim does not implicate any rights of the petitioner, it is difficult to see how the failure of petitioner's attorney to assert it constitutes "prejudice" as defined in *Strickland.* The issue bears no relation to the defendant's guilt or innocence and as such cannot undermine confidence in the verdict; nor does it raise any concern over the adversarial testing of the government's case. While *Batson* may have some incremental effect in protecting the interests of the parties in a neutral factfinder, *Allen*, 478 U.S. at 259, 106 S.Ct. 2878, there is no contention that the jury was unrepresentative or that the other procedural mechanisms in place did not ensure the jurors selected were "free from bias." *Id.* McRae cannot possibly demonstrate that the replacement of one or two admittedly impartial jurors with one or two other equally impartial jurors would have a reasonable probability of altering the verdict. There is simply no cognizable claim under *Strickland* where the ineffectiveness concerns an alleged *Batson* violation but no indication of an unrepresentative, biased, or otherwise unfair jury.

## II. PETITIONERS' INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS LACK MERIT IN ANY CASE

A. *Morales' Ineffective Assistance of Counsel Claim Lacks Merit Because There Was Probable Cause For His Arrest And No Violation of the Fourth Amendment*

■ Even if Morales could satisfy *Strickland's* prejudice requirement based on the failure to properly litigate a Fourth Amendment issue, his petition lacks merit and must be denied. "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious ..." *Kimmelman*, 477 U.S. at 375, 106 S.Ct. 2574. Morales cannot meet this standard. The officers clearly had probable cause to arrest Morales. Thus, the subsequent search was legal and admission of the discovered controlled substances was entirely proper.

Probable cause is not the equivalent of a prima facie case. *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Rather, it requires only facts sufficient to " 'warrant a man of reasonable caution in the belief' " that an offense has been committed; "it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). As the Supreme Court has repeatedly emphasized:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.... The rule of probable cause is a practical, nontechnical conception....

*Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Morales was arrested in a location known to have significant narcotics activity-the very reason for conducting a buy and bust operation in that area (Tr. 16–17). The witness at the suppression hearing,

Detective Charles Gallogly, testified that Undercover Officer 2787 observed the defendant engage in four transactions that appeared to be narcotics sales. Although the undercover officer did not actually see any controlled substances change hands during the first three transactions, he observed the fourth individual, Reynaldo Ruiz, carrying a glassine envelope immediately after exchanging currency with Morales. From his years of experience as a narcotics officer, Undercover 2787 knew that such glassine envelopes were often used in the packaging of controlled substances, and radioed the rest of his team to intercept Ruiz (Tr. 14–15, 22–25). Officer Gallogly arrested Ruiz and found a single envelope of a white powdery substance which appeared to be heroin. The envelope was marked "Superpower." (Tr. 17). At this point, the officers had a reasonable belief that Morales had engaged in the sale of illicit controlled substances. They took Morales into custody, and conducted a brief frisk for weapons, which revealed $83 in cash (Tr. 33). A more thorough search was conducted upon bringing Morales through central booking, and over twenty envelopes of heroin were found in his underwear and a secret compartment in his belt. The glassine envelopes containing the heroin were stamped "Superpower," matching the envelope recovered from Ruiz (Tr. 18–19). Under these circumstances, there was no non-frivolous basis on which to challenge Morales' arrest.

 Moreover, the issues argued by appellate counsel, though ultimately unavailing, possessed considerably greater merit than the Fourth Amendment claim and created a far better likelihood of victory. Thus, appellate counsel may not be faulted for failing to raise the Fourth Amendment issue on appeal. As the Second Circuit recently explained:

In attempting to demonstrate that appellate counsel's failure to raise a ...

claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made. However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.

*Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir.2000) (internal citations omitted). Morales cannot demonstrate that the claim he faults appellate counsel for not raising was clearly and significantly stronger than the claims appellate counsel did advance. If anything, the opposite is true. Accordingly, Morales' ineffective assistance of counsel claim must be denied.

B. *McRae's Ineffective Assistance Claims Lack Merit Because He Cannot Show That His Attorney's Actions Were Objectively Unreasonable*

Under *Strickland*, in order to prevail on an ineffective assistance of counsel claim the petitioner must show both that counsel's representation fell below an objective standard of reasonableness, 466 U.S. at 688, 104 S.Ct. 2052, and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. 2052. Counsel is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 689, 104 S.Ct. 2052; *see also United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Petitioner may rebut this presumption only by showing that "in light of all the circumstances, the identified acts or omissions [by counsel]

were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Indeed, since "[t]here are countless ways to provide effective assistance in any given case," *id.* at 689, 104 S.Ct. 2052, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. 2052. There is simply no evidence to suggest that the state court deciding petitioner's motion under CPL § 440 failed to apply or unreasonably applied this standard in rejecting petitioner's ineffective counsel claim. 28 U.S.C. § 2254(d); *Williams v. Taylor,* 529 U.S. 362, 410, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

### 1. *McRae's Claim of Discrimination in Jury Selection is Conclusory and Unsupported by Any Facts in the Record*

Petitioner's contention that counsel's failure to raise a *Batson* challenge constitutes ineffective assistance of counsel must be denied, as McRae cannot demonstrate any violation under *Batson.* Nor can petitioner show that Justice Cooperman's rejection of this claim was an erroneous or unreasonable application of clearly established law.

 *Batson* set forth a three-part test that trial courts are to employ in evaluating allegations of race-based exercise of peremptory challenges. A trial court must first determine whether the party challenging the peremptory strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race. *See Hernandez v. New York,* 500 U.S. 352, 356, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Jordan v. Lefevre,* 206 F.3d 196, 200 (2d Cir. 2000). Such a *prima facie* case may be established by showing a pattern of challenges against minority prospective jurors. *Batson,* 476 U.S. at 97, 106 S.Ct. 1712. Once a *prima facie* case is established, the trial court must require the non-moving party to proffer a race-neutral explanation for striking the potential juror. *Id.; Hernandez,* 500 U.S. at 358–59, 111 S.Ct. 1859. This explanation need not be "persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

Finally, the court must evaluate whether the moving party has carried his burden of proving that the strike was motivated by purposeful discrimination. *Id.* at 98, 106 S.Ct. 1712. This analysis "largely will turn on evaluation of the credibility" and the demeanor of the attorney offering the race-neutral explanation for the strike. *Id.* at 365, 111 S.Ct. 1859 (quoting *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712). Since "[t]he credibility of an attorney offering a race-neutral explanation is at the very heart of [the] analysis," *Barnes v. Anderson,* 202 F.3d 150, 157 (2d Cir.1999), the reviewing court "ordinarily should give [the trial court's] findings great deference." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712; *see also Hernandez,* 500 U.S. at 364, 111 S.Ct. 1859.

The sum of petitioner's allegations of ineffectiveness with respect to the *Batson* issue is that he told counsel it was "unfair" for the prosecutor to eliminate all African–American jurors, and that counsel told him not to worry about it because he "kn[e]w someone on the jury." (Affidavit of Jamal McRae, at ¶ 7, Ex. A to Forshaw Aff.). Justice Cooperman, who also presided over the voir dire before being called upon to decide petitioner's 440 motion, rejected McRae's *Batson* claim as "baseless," finding that McRae had made no showing that African Americans were systematically excluded from the jury. *People v. McRae,* No. 5474/94, at 6.

■ There is an insufficient basis for concluding that this decision was "contrary to" clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. While statistics alone may be sufficient to establish a *prima facie* case of discrimination in "appropriate circumstances," petitioner bears "the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court." *Overton,* 295 F.3d at 278–280. This was simply not done in the instant case. There is nothing in the record to show how many African–Americans were in the total venire, how many challenges the prosecution used against African–American jurors, or whether the jurors possessed race-neutral characteristics that would disqualify them from service or render them undesirable jurors. Indeed, it appears from the record that neither party noted the races of the venirepersons, so it is now impossible to determine how many non-white jurors were challenged, which of the prosecution's challenges were exercised against non-white jurors, and the ultimate racial composition of the jury. In the absence of any supporting evidence to give meaning to the statistics, the petitioner's bare assertion that the prosecution eliminated all African–Americans from the jury is not sufficient to establish an inference of discrimination. *See Overton,* 295 F.3d at 279–80 (because petitioner failed to fully develop the facts before the trial judge, "[w]e cannot say, on this record, that the trial judge's refusal to implement *Batson's* process for testing each questioned challenge midway in the process was an unreasonable application of the *Batson* requirements"); *see also* 28 U.S.C. § 2254(e)(2) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court [on a habeas petition] shall not hold an evidentiary hearing on the claim unless the applicant shows

that … the claim relies on … a new rule of constitutional law … or … a factual predicate that could not have been previously discovered").

2. *Counsel's Decision Not to Call McRae's Mother as a Witness Was A Rational Reaction to Her Testimony in the First Trial Which Revealed Her Alibi Testimony to be Unhelpful and Potentially Damaging*

■ Petitioner contends that counsel's decision not to call his mother as a witness at retrial was unreasonable and resulted in his conviction. However, the record demonstrates that McRae's counsel made a reasonable and informed strategic decision, based on his knowledge and expertise, not to call petitioner's mother as a witness at McRae's second trial.

Counsel submitted an affirmation to the 440 court stating that he had "a specific tactical reason for deciding not to have [McRae's] mother testify at the second trial." (Affirmation of Morris Mirsky, Ex. B to Forshaw Aff.). Although Mirsky did not articulate precisely what that tactical reason was, Justice Cooperman identified considerable evidence in the record which justified counsel's strategy and supported the presumption that counsel's actions are "sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. During petitioner's first trial, his mother provided him with an alibi for the evening of Sunday, September 18, 1994, even though the robbery occurred on the prior evening, Saturday, September 17, 1994. Mrs. McRae also attempted to testify that September 17 was in fact a Sunday night, but this inconsistency was brought out at trial. *See People v. McRae,* No. 5474/94, at 4. Inasmuch as Mrs. McRae's credibility was already inherently suspect due to her relationship with the defendant, to have had

her alter her testimony at the second trial in order to conform it to the proof would have not only further undermined her credibility, but could have proven devastating to petitioner if the jury believed he had assisted in offering fabricated testimony. Accordingly, Justice Cooperman rejected petitioner's claim and found that "trial counsel made a conscientious and reasoned decision not to present this defense at the second trial."

Moreover, petitioner cannot satisfy the prejudice standard of *Strickland*. Petitioner's conclusion that it must have been the failure to call his mother that made the difference in the outcomes of his two trials is pure speculation. McRae has not identified anything in the record that would support this conclusion and has certainly not demonstrated a "reasonable probability" that the jury's verdict would have been different absent counsel's erroneous decision. As the 440 court found, "it is just as likely that jurors [at the first trial] voted to convict based upon her testimony or regardless of her testimony." *People v. McRae*, No. 5474/94, at 4. Justice Cooperman did not unreasonably apply the prejudice component of *Strickland*, and his decision is supported by the evidence, including the general lack of credibility displayed by Mrs. McRae in testifying on behalf of her son, the inconsistency regarding the date of her alibi testimony, and the totality of the evidence against petitioner.

3. *McRae Cannot Show That His Counsel's Alleged Conflict of Interest Affected The Disposition of His Case in Any Way*

■■■ Petitioner also complains that his counsel operated under an impermissible conflict of interest at the second trial because he had obtained from petitioner's father a confession of judgment to secure payment of his retainer. However, Mirsky's possession of a judgment against Ed-

die and Theresa McRae to ensure the collection of attorneys fees does not entitle Jamal McRae to a reversal of his conviction since there is no evidence that a conflict of interest adversely affected Mirsky's representation.

To the extent that petitioner suggests that he is entitled to automatic reversal as a result of this alleged conflict, he is incorrect, and the state court did not unreasonably apply settled Supreme Court law in rejecting petitioner's claims. . The Supreme Court has recognized only a single setting in which a conflict of interest will trigger automatic reversal: where an attorney is required, over his or her objection, to represent simultaneously the divergent interests of multiple defendants. *See Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Outside the narrow scope of this *per se* rule, a defendant who asserts a conflict of interest is required "at least" to show that the conflict "adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1245, 152 L.Ed.2d 291 (2002) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Justice Cooperman correctly applied this clearly established law by noting that "[a] defendant is entitled to relief only upon satisfying the burden of showing that the possible conflict of interest affected the defense in such a way that meaningful representation was not supplied under the Federal and State constitutions." *People v. McRae*, No. 5474/94, at 6. Justice Cooperman went on to find that even if the retainer agreement and confession of judgment arrangement was "less than ethically recommended," McRae was not entitled to relief because he "has not established that it had any influence on his attorney's effectiveness." *Id.* at 7.

Justice Cooperman's decision is not an unreasonable application of clearly estab-

lished Supreme Court precedent, and is well supported by the record in this case. Petitioner cannot establish that his counsel's filing of a confession of judgment created either a potential or actual conflict of interest, as counsel's receipt of his fee was not dependent on his success or failure at trial. Even if it were, that by itself would not justify habeas relief unless petitioner could show that such a conflict adversely affected counsel's performance and led to an "actual lapse in representation." *Winkler v. Keane*, 7 F.3d 304, 309 (2d Cir.1993) (actual conflict created by contingency fee arrangement that provided for large fee if petitioner were acquitted did not require habeas relief because petitioner could not prove both that counsel failed to pursue any viable strategies and that he did so because of other loyalties or incentives). "To prove the lapse in representation 'a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " *United States v. Feyrer*, 333 F.3d 110, 2003 WL 21398872 (2d Cir. June 18, 2003) (quoting *United States v. Schwarz*, 283 F.3d 76, 92 (2d Cir.2002)).

Moreover, the fee arrangement about which petitioner complains clearly existed during McRae's first trial. As Justice Cooperman reasoned, it is sheer speculation to assume that counsel did not call petitioner's mother as a witness or preserve a *Batson* claim because of the existence of the fee arrangement and confession of judgment, especially where the exact same incentives were present during the first trial, about which McRae makes no complaint. *People v. McRae*, No. 5474/94, at 8. Finally, McRae's claim that a conflict of interest adversely affected his counsel's performance is contingent upon a finding that Mirsky's decision not to call Theresa McRae to the

stand and failure to raise a *Batson* objection during jury selection amounted to a failure to pursue plausible alternative strategies. Petitioner has failed to meet his burden on this issue as well. Indeed, as discussed above, counsel's actions were objectively reasonable.

### III. McRAE'S CHALLENGE TO THE SUFFICIENCY OF THE EVIDENCE

Petitioner contends that the evidence presented at trial was legally insufficient to sustain his conviction. The Supreme Court has held that a state criminal conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.No. 104–132, 110 Stat. 1214, a writ of habeas corpus may be issued for evidentiary insufficiency only if the state court unreasonably applied the *Jackson* standard. Whether viewed *de novo* or examined under AEDPA, the evidence was sufficient to sustain petitioner's conviction. The Appellate Division reasonably and carefully applied the *Jackson* standard when determining that the trial evidence was sufficient to sustain petitioner's conviction. It noted that the "resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the jury, which saw and heard the witnesses." *People v. McRae*, 283 A.D.2d 443, 724 N.Y.S.2d 625 (2d Dep't.2001) (citing *People v. Gaimari*, 176 N.Y. 84, 94, 68 N.E. 112 (1903)). The Appellate Division then went on to state that the jury's determinations of credibility "must be accorded

great weight on appeal and should not be disturbed unless clearly unsupported by the record." *Id.* (citing *People v. Garafolo*, 44 A.D.2d 86, 88, 353 N.Y.S.2d 500 (2d Dep't.1974)). Applying this correct standard of review, and conducting its own independent analysis of the facts pursuant to CPL 470.15[5], the Appellate Division reasonably concluded that the evidence at trial, viewed in the light most favorable to the prosecution, was sufficient to sustain a conviction beyond a reasonable doubt. *See People v. McRae*, 283 A.D.2d at 443, 724 N.Y.S.2d 625.

In any event, petitioner's claim fails under the traditional analysis as well since the record does not support a finding that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. A federal habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of a state criminal conviction. *Einaugler v. Supreme Court of the State of New York*, 109 F.3d 836, 840 (2d Cir.1997). All inferences from the evidence must be drawn in favor of the prosecution and the jury's assessment of the credibility of witnesses may not be second-guessed. *See Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994). Thus, under this "rigorous standard" a " 'federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir.1994) (quoting *Jackson*, 443 U.S. at 326, 99 S.Ct. 2781).

Petitioner was charged with two counts of Robbery in the First Degree, in violation of N.Y. Penal Law § 160.15(3), (4); two counts of Robbery in the Second Degree, in violation of N.Y. Penal Law § 160.10(1), (2–a); and one count of Assault in the Second Degree, in violation of

N.Y. Penal Law § 120.05. A person is guilty of Robbery in the First Degree when he "forcibly steals property" and, in the course of the commission of the crime or of immediate flight therefrom, he "[u]ses or threatens the immediate use of a dangerous instrument" or "[d]isplays what appears to be a pistol ... or other firearm." N.Y. Penal Law § 160.15(3), (4). Robbery in the Second Degree requires forcible theft of property coupled with the assistance of accomplices, or "caus[ing] physical injury to any person who is not a participant in the crime." N.Y. Penal Law § 160.10(1), (2–a). Assault in the Second Degree occurs when "[w]ith intent to cause serious physical injury to another person, [the defendant] causes such injury to such person or to a third person"; or "[w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument"; or "[i]n the course of and in furtherance of the commission or attempted commission of a felony," the defendant "causes physical injury to a person other than one of the participants." N.Y. Penal Law § 120.05(1), (2), (6).

Considered in the light most favorable to the prosecution, both the direct and circumstantial evidence presented at trial was sufficient for a rational jury to conclude that petitioner, acting in concert with others, forcibly stole property from car service driver Morales at gunpoint, and intentionally caused severe injuries to the victim using dangerous instrumentalities. Mr. Morales testified to the events in question and clearly identified petitioner McRae as one of his attackers. McRae sat in the front seat next to him so Morales had a lengthy opportunity to view the defendant from up close. He identified McRae again several weeks after the incident, in a local bodega. Upon arresting McRae at Morales' insistence, the police

then traced the call to Morales' dispatcher on the night of the assault and found that McRae lived at the same address with the same telephone number as the person who had called Morales' dispatcher to request the car service that night. This powerful circumstantial evidence of guilt corroborated Mr. Morales' testimony and was unrebutted by the defendant, who had attempted to provide an explanation for this unbelievable coincidence in the first trial but his witness provided an alibi for the wrong night. Moreover, considering that this corroborating evidence was ascertained only after Morales specifically identified McRae as his attacker, the testimony of McRae's mother that attempted to implicate other individuals in the crime was not credible in any case.

McRae opposes his conviction by arguing that the prosecution's case was replete with inconsistencies. He points out that none of the assailants were arrested on the night of the crime despite the police having access to the dispatcher register containing a record of where the assailants were picked up from. He also notes that none of the stolen property was ever recovered or found in his possession. McRae further contends that Morales' identification of him as the assailant was tainted as it occurred over two months after the crime, and Morales was unable to identify him from a photo array just a few days after the crime. Finally, McRae argues that Morales told police his assailant was Jamaican and had an accent, while petitioner was born and raised in the United States. Petitioner's arguments simply attack the credibility of prosecution witnesses, which must be determined by the jury. *See Hoffa v. United States*, 385 U.S. 293, 311–12, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ("The established safeguards of the Anglo–American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury."); *United States v. Weinstein*, 452 F.2d 704, 713–14 (2d Cir.1971) ("when testimony is once before the jury, the weight and credibility of every portion of it is for them, and not for the Court to determine") (citations omitted). In light of the substantial evidence of petitioner's guilt, and I cannot say, weighing all inferences in favor of the prosecution, that the jury's decision was erroneous.

## CONCLUSION

The petitions for a writ of habeas corpus are denied. I also deny certificates of appealability.

**SO ORDERED.**